IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-cv-02836-NYW

THOMAS M. JASCHKE,

     Plaintiff,

v.

CAROLYN W. COLVIN,

     Defendant.

---

MEMORANDUM OPINION AND ORDER

---

Magistrate Judge Nina Y. Wang

   This action comes before the court pursuant to Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 401-33 for review of the Commissioner of Social Security's ("Commissioner" or "Secretary") final decision denying Plaintiff, Thomas M. Jaschke's, application for Disability Insurance Benefits ("DIB"). Pursuant to the Order of Reference dated September 17, 2014 and the Order of Reassignment dated February 10, 2015, this civil action was referred to the Magistrate Judge "for all purposes" pursuant to the Pilot Program to Implement the Direct Assignment of Civil Cases to Full Time Magistrate Judges and Title 28 U.S.C. § 636(c). [*See* #31 and #32]. The court has carefully considered the Complaint filed October 17, 2013 [#1], Defendant's Answer filed January 27, 2014 [#13], Plaintiff's Opening Brief filed April 30, 2014 [#19], Defendant's Response Brief filed August 4, 2014 [#24], Plaintiff's Reply Brief filed September 4, 2014 [#27], the entire case file, the administrative record, and applicable case law. For the following reasons, I affirm the Commissioner's decision.

## PROCEDURAL HISTORY

On October 1, 2010, Mr. Jaschke filed an application for DIB under Title II of the Act. [*See* #14-6 at 194-195].[1]   At the time, Mr. Jaschke was 47 years old, had a high school education and an associates' degree in automotive repair and business, and had worked as a master auto mechanic.   He alleged in the application that he became disabled on January 28, 2008 when, while at work, he attempted to lift a 1996 Chevy Impala by grasping the left front fender. [#14-6 at 195; #14-8 at 303; #19 at 2].   Upon lifting the car, Plaintiff felt "immediate and severe low back pain." [#14-8 at 303].   He thereafter rested in a chair before attempting to lift the other side of the vehicle.   *Id.* Within fifteen to twenty minutes afterward, his right leg felt numb and he experienced significant lower back pain.   *Id.*   Plaintiff later amended the alleged onset date of disability to July 9, 2008.   [#14-6 at 65].   Administrative Law Judge Jon L. Lawritson ("ALJ") denied Mr. Jaschke's application after an administrative hearing held February 27, 2012, at which Plaintiff was represented by counsel.   [#14-3 at 38-55, 63-99].

At the administrative hearing, Plaintiff walked with a cane, stood for the majority of the hearing, and leaned against the wall. [#14-3 at 82].   He testified that he had pain in his low back, right knee, left knee to some extent, and left wrist; could sit for only a matter of seconds; could stand in one position for five minutes; and that walking was more comfortable for him than standing or sitting. [#14-3 at 82-83].   He testified that the pain wakes him throughout the night approximately four times a week.   [*Id.* at 88].   He further testified that most of the day he is "[s]quirming on the ground, laying down on a flat…[using] an outdoor hammock in the living

---

[1]   The court uses this designation to refer to the Electronic Court Filing system ("ECF") document number and the page number of that document, or where applicable, the page number of the Administrative Record as provided by the Parties.

room," and that he is in a horizontal position for "70 plus percent" of his day.  [*Id.* at 83-84].  Mr. Jaschke underwent back surgery on March 9, 2010, and testified that prior to the surgery he was unable to sit on a commode and that "there was so much pain that sometimes it's like [I] couldn't communicate."   [*Id.* at 84].  He further testified that the pain in his wrists fluctuates, he often drops items, and with respect to reaching to the side, overhead, and front, he can reach to the side "not so good, front is bad, overhead is very difficult especially with the left shoulder."  [*Id.* at 85].  Mr. Jaschke represented that prior to his surgery, he could not lift and carry twenty pounds, and that after the surgery he was better able to lift and carry weight and reach over his head.  [*Id.* at 86].  Plaintiff stated that for approximately three hours every day he engages in physical therapy for his back and knees ranging from at-home stretches to gym exercises and a water arthritis class.  [*Id.* at 88-89].  He testified that he eats while lying on his side on the ground or sofa, his wife or daughter completes the household chores, and he does not attend church, sporting events, or the movies.  [*Id.* at 90].  Mr. Jaschke represented that he reads short magazine articles and short stories in books, but is unable to read long books, and that he watches television for a couple of hours each evening but only occasionally uses a computer.  [*Id.* at 90].  In response to questioning by the ALJ, Plaintiff stated that he worked in a transmission shop as a service writer from February 2009 until shortly before his surgery in July 2009, while at work he usually leaned over a sofa in the shop to relieve his back from pressure, and he was unable to sit much because of his symptoms.  [*Id.* at 94-95].  He reported that he was ultimately fired for being a danger to himself and others.  *Id.*

An impartial medical expert and orthopedic surgeon, Dr. Michael Gurvey, testified that based on his review of Plaintiff's records, he had identified "four basic areas" of impairment that he believed were supported by test studies or clinical findings: chronic low back pain; left knee

pain; obesity; and opiate habituation.  [#14-3 at 68].  Dr. Gurvey also testified that, between July 9, 2008 and March 9, 2010 (the "First Period") and September 9, 2010 and the time of the administrative hearing (the "Third Period"), Mr. Jaschke's impairments did not meet or equal one of a number of listed impairments under the Act so as to preclude substantial gainful activity.  [#14-3 at 69-70].  However, in Dr. Gurvey's opinion, Mr. Jaschke's condition did meet or equal one or more listed impairments from March 9, 2010, the date of the surgery, through September 9, 2010, during which time Plaintiff was in a post-operative condition (the "Second Period").  [*Id.* at 70].  Dr. Gurvey opined that during the First Period and Third Period, Plaintiff was in "a light category of lift and carry, occasionally 20 pounds, frequently 10 pounds. He could stand, sit and walk six out of eight hours each with the usual breaks in an eight hour day." Dr. Gurvey placed no push or pull restrictions on Plaintiff during this time, and stated "[p]osturally he should not climb ladders, scaffolds or ropes on a prophylactic basis because of his obesity…he could occasionally crawl…[t]here would be no manipulative, audio-visual, communicative restrictions [and] he should avoid unprotected heights."   [*Id.* at 69-70]. Plaintiff's attorney had no objection to Dr. Gurvey's qualification as an expert.  [*Id.* at 67].

Finally, Ashley Bryars testified as a vocational expert ("VE").  The ALJ posed two hypothetical scenarios to the VE.  First, he questioned whether the following hypothetical individual could work as a service writer or automobile mechanic: performs work at the light exertional level; can sit, stand, and walk six hours during an eight hour work day; cannot push or pull, climb ladders, ropes, or scaffolds; can occasionally crawl; and cannot work at unprotected heights.  [#14-3 at 92].  The VE testified that such a person could serve as a service writer, and that a service writer had a skill level of seven, which generally requires between two and four

years of experience.[2]  *Id.*  Next, the ALJ posed the same hypothetical but for a person who could not perform as a service writer.  [*Id.* at 95-96].  The VE testified that such a person could work as an electrical accessories assembler, a merchandise marker, or a collator operator.  [*Id.* at 96].

The ALJ issued his written decision on July 17, 2010, concluding that Mr. Jaschke was not disabled.  [#14-3 at 38-55].  On September 18, 2012, Plaintiff submitted new evidence in the form of an evaluation and report with a request for review of the ALJ's decision, which the Appeals Council denied on August 29, 2013.  [#14-2 at 1-6).  The decision of the ALJ then became the final decision of the Commissioner.  20 C.F.R. § 404.981; *Nielson v. Sullivan*, 992 F.2d 1118, 1119 (10th Cir. 1993) (citation omitted).  Plaintiff filed this action on October 17, 2013.  The court has jurisdiction to review the final decision of the Commissioner.  42 U.S.C. § 405(g).

## STANDARD OF REVIEW

In reviewing the Commissioner's final decision, the court is limited to determining whether the decision adheres to applicable legal standards and is supported by substantial evidence in the record as a whole.  *Berna v. Chater*, 101 F.3d 631, 632 (10th Cir. 1996) (citation omitted); *Pisciotta v. Astrue,* 500 F.3d 1074, 1075 (10th Cir. 2007).  The court may not reverse an ALJ simply because she may have reached a different result based on the record; the question instead is whether there is substantial evidence showing that the ALJ was justified in her decision.  *See Ellison v. Sullivan,* 929 F.2d 534, 536 (10th Cir. 1990).  "Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Flaherty v. Astrue,* 515 F.3d 1067, 1070 (10th Cir. 2007) (internal citation omitted).  Moreover, the court "may neither reweigh the evidence nor substitute

---

[2] A service writer composes a written plan for the maintenance of a vehicle to be provided to a customer following an auto mechanic's evaluation.  [#14-3 at 92-93].

[its] judgment for that of the agency." *White v. Massanari*, 271 F.3d 1256, 1260 (10th Cir. 2001), *as amended on denial of reh'g* (April 5, 2002).  *See also Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) ("The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence.") (internal quotation marks and citation omitted).   However, "[e]vidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion." *Musgrave v. Sullivan,* 966 F.2d 1371, 1374 (10th Cir. 1992) (internal citation omitted).   The court will not "reweigh the evidence or retry the case," but must "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met."  *Flaherty,* 515 F.3d at 1070 (internal citation omitted).   Nevertheless, "if the ALJ failed to apply the correct legal test, there is a ground for reversal apart from a lack of substantial evidence."  *Thompson v. Sullivan,* 987 F.2d 1482, 1487 (10th Cir. 1993) (internal citation omitted).

## ANALYSIS

### A.    Mr. Jaschke's Challenge to ALJ's Decision

An individual is eligible for DIB benefits under the Act if he is insured, has not attained retirement age, has filed an application for DIB, and is under a disability as defined in the Act. 42 U.S.C. § 423(a)(1).  An individual is determined to be under a disability only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy…." 42 U.S.C. § 423(d)(2)(A).   The disabling impairment must last, or be expected to last, for at least 12

consecutive months. *See Barnhart v. Walton*, 535 U.S. 212, 214-15 (2002).   Additionally, the claimant must prove he was disabled prior to his date last insured.  *Flaherty*, 515 F.3d at 1069.

The Commissioner has developed a five-step evaluation process for determining whether a claimant is disabled under the Act.   20 C.F.R. § 404.1520(a)(4)(v).  *See also Williams v. Bowen*, 844 F.2d 748, 750-52 (10th Cir. 1988) (describing the five steps in detail). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Williams*, 844 F.2d at 750.   Step one determines whether the claimant is engaged in substantial gainful activity; if so, disability benefits are denied.  *Id.*   Step two considers "whether the claimant has a medically severe impairment or combination of impairments," as governed by the Secretary's severity regulations.  *Id.*; *see also* 20 C.F.R. § 404.1520(e).   If the claimant is unable to show that his impairments would have more than a minimal effect on his ability to do basic work activities, he is not eligible for disability benefits. If, however, the claimant presents medical evidence and makes the *de minimis* showing of medical severity, the decision maker proceeds to step three.  *Williams*, 844 F.2d at 750.   Step three "determines whether the impairment is equivalent to one of a number of listed impairments that the Secretary acknowledges are so severe as to preclude substantial gainful activity," pursuant to 20 C.F.R. § 404.1520(d).  *Id.*   At step four of the evaluation process, the ALJ must determine a claimant's Residual Functional Capacity (RFC), which defines what the claimant is still "functionally capable of doing on a regular and continuing basis, despite his impairments: the claimant's maximum sustained work capability."  *Williams*, 844 F.2d at 751. The ALJ compares the RFC to the claimant's past relevant work to determine whether the claimant can resume such work.  *See Barnes v. Colvin*, No. 14-1341, 2015 WL 3775669, at *2 (10th Cir. June 18, 2015) (internal quotation marks omitted) (citing *Winfrey v. Chater*, 92 F.3d

1017, 1023 (10th Cir. 1996) (noting that the step-four analysis includes three phases: (1) "evaluat[ing] a claimant's physical and mental [RFC]"; (2) "determin[ing] the physical and mental demands of the claimant's past relevant work"; and (3) assessing "whether the claimant has the ability to meet the job demands found in phase two despite the [RFC] found in phase one.")).  "The claimant bears the burden of proof through step four of the analysis."  *Neilson*, 992 F.2d at 1120.

At step five, the burden shifts to the Commissioner to show that a claimant can perform work that exists in the national economy, taking into account the claimant's RFC, age, education, and work experience.  *Neilson*, 992 F.2d at 1120.

> . . . A claimant's RFC to do work is what the claimant is still functionally capable of doing on a regular and continuing basis, despite his impairments: the claimant's maximum sustained work capability. The decision maker first determines the type of work, based on physical exertion (strength) requirements, that the claimant has the RFC to perform. In this context, work existing in the economy is classified as sedentary, light, medium, heavy, and very heavy. To determine the claimant's "RFC category," the decision maker assesses a claimant's physical abilities and, consequently, takes into account the claimant's exertional limitations (i.e., limitations in meeting the strength requirements of work). . . .
>
> If a conclusion of "not disabled" results, this means that a significant number of jobs exist in the national economy for which the claimant is still exertionally capable of performing. However, . . . [t]he decision maker must then consider all relevant facts to determine whether claimant's work capability is further diminished in terms of jobs contraindicated by nonexertional limitations.
>     …
>
> Nonexertional limitations may include or stem from sensory impairments; epilepsy; mental impairments, such as the inability to understand, to carry out and remember instructions, and to respond appropriately in a work setting; postural and manipulative disabilities; psychiatric disorders; chronic alcoholism; drug dependence; dizziness; and pain….

*Williams*, 844 F.2d at 751-52.  The Commissioner can meet his or her burden by the testimony of a vocational expert. *Tackett v. Apfel*, 180 F.3d 1094, 1098–1099, 1101 (9th Cir. 1999).

The ALJ first determined that Mr. Jaschke was insured for disability through December 31, 2013.  [#14-3 at 40].  Next, following the five-step evaluation process, the ALJ determined that Mr. Jaschke: (1) had not engaged in substantial gainful activity between the alleged onset date of July 9, 2008 and his date last insured of December 31, 2013; (2) had severe impairments of "a history of lumbar fusion, lumbar degenerative disk disease, a history of bilateral knee pain and arthroscopies and obesity"; and (3) did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in Title 20, Chapter III, Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526).  At step four, the ALJ found that Plaintiff had RFC to perform light work as defined in 20 C.F.R. § 404.1567(b), "except that he can sit, stand and walk 6 hours each in an 8 hour day, never push or pull, never climb ladders, ropes or scaffolds, occasionally crawl and never tolerate exposure to unprotected heights."   [#14-3 at 40-53].   Finally, the ALJ determined that "[c]onsidering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform."  [*Id.* at 54].

Mr. Jaschke contends that substantial evidence of the record does not support the ALJ's decision that he was not disabled during the relevant time period, and the ALJ did not apply the correct legal standards in arriving at his determination.  [#19 at 5, 29-48].

**B.      ALJ's Assessment of Plaintiff's Physical Impairments**

RFC determinations are for the ALJ to make "based on the entire case record, including the objective medical findings and the credibility of the claimant's subjective complaints." *Poppa v. Astrue*, 569 F.3d 1167, 1170-71 (10th Cir. 2009).  *See also* 20 C.F.R. § 416.946 (providing ALJ is responsible for assessing residual functional capacity).  In reaching his RFC

finding, the ALJ considered Plaintiff's symptoms and "the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." [#14-3 at 46].

1. Medical Records

   a. *Back Pain*

Mr. Jaschke injured his back on January 28, 2008 while at work. [#14-2 at 9; #14-8 at 303]. The same day, he was examined by workers' compensation physician Dr. William Ford with WorkWell Occupational Medicine. [#14-12 at 715]. Dr. Ford recorded that Plaintiff rated his pain as 7 out of 10 with 10 being the worst pain, and complained of pain "in the central low back from L1 through L5," and "with range of motion," but did not have "any radicular symptoms." *Id.* Two days later, Dr. Ford recorded that Mr. Jaschke still had mild to moderate soreness in his lower back, but that Plaintiff felt the pain had improved and was "feeling much better." [#14-10 at 472]. Dr. Ford noted that Plaintiff had full range of motion of the lumbar spine, was "nontender," and his "lower extremity strength [was] intact." *Id.* At that time, Plaintiff was ingesting 800 milligrams of ibuprofen, three times a day, and stretching. *Id.*

Dr. Ford and Dr. Peter Mars, also with WorkWell Occupational Medicine, treated Mr. Jaschke between the date of the accident and June 12, 2008. [#14-12 at 679-717]. During this time, they recommended that Plaintiff change positions frequently, avoid lifting over twenty pounds, lift or carry objects up to ten pounds frequently, and refrain from frequent squatting, bending, or climbing. [*Id.*] They also recommended that Plaintiff continue taking ibuprofen, participating in home exercise, and continue with physical therapy. [*Id.*]

On March 10, 2008, Mr. Jaschke underwent an MRI following reports that the pain, though improved with physical therapy and medication, was "not changing." [#14-12 at 695].

Dr. Ford noted that Plaintiff has "no real radicular components," and was not working because his company had closed. *Id.* He referred Plaintiff to workers' compensation physician Dr. Angelo Ramagosa after determining "there is a probable HNP at L5S1." *Id.* The MRI revealed a small to moderate sized disc protrusion in Plaintiff's back along with minimal to mild narrowing and moderate degeneration. [#14-8 at 324-325]. Dr. Mars opined that "[d]isk material approaches and possibly contacts the anterior margins of the nerve roots." *Id.* The same month, Dr. Ramagosa examined Mr. Jaschke and reported that Plaintiff had a normal gait, full range of motion, no tenderness in his back, intact sensation, normal muscle bulk and tone, normal strength, and a normal straight leg raise test. [#14-8 at 330-332]. A nerve conduction study suggested Plaintiff had some damage to his nerves but no lumbar radiculopathy on either side. [#14-8 at 332]. Plaintiff observed that use of the prescription Medrol Dosepak had dramatically decreased the low back pain. [#14-8 at 330]. Dr. Ramagosa recommended that Plaintiff follow the work restrictions set forth by Dr. Mars and continue with exercises to strengthen his lower back. [#14-8 at 332]. An April 22, 2008 x-ray of Mr. Jaschke's back revealed mild degenerative disc disease and normal alignment with no instability. [#14-8 at 323]. On June 27, 2008, Plaintiff began seeing workers' compensation orthopedic physician Dr. Robert Benz, who summarized the April 2008 x-rays as showing a "very mild leg length discrepancy and a mild scoliotic deformity that extends into his thoracic spine" as well as a "fair amount of narrowing of his L5-S1 disc space." [#14-12 at 747]. Dr. Benz opined that the MRI indicated "a broad-based disc herniation at L5-S1 which contacts the traversing nerve roots bilaterally," and "some mild facet overgrowth at this level with some mild facet synovitis." *Id.* Dr. Benz further opined that Mr. Jaschke was "not a great surgical candidate" and that an L5-S1 fusion was the only procedure available. [#14-12 at 747]. Dr. Benz recommended that Plaintiff

continue with a home exercise program and anti-inflammatory medications, and instructed Mr. Jaschke to consider the spinal fusion only if he felt his symptoms were "intolerable." *Id.* Dr. Benz recommended that Plaintiff lift weight no greater than 25 pounds and not engage in repetitive twisting, bending, or stooping. [#14-12 at 746].

In August 2008, Mr. Jaschke saw Dr. James Ogsbury for an independent medical examination for the purposes of his workers' compensation claim. [#14-15 at 851-856]. Dr. Ogsbury reported that Plaintiff had no dramatic tenderness or muscle spasm in his back, had a normal straight leg raise test, and normal external rotation of his hips, gait, heel and toe walking, hip, knee, foot and toe flexion, and intact sensation. [#14-15 at 852-854]. He further reported degenerative changes in Plaintiff's back with mild stenosis, and confirmed the small central disc protrusion but noted that it was without foraminal or neural involvement. [#14-15 at 854]. Dr. Ogsbury also noted that, "the absence of neurological findings on exam and the absence of a large herniation on MRI is entirely expected and consistent with the low back pain syndrome," and that, "[s]imilarly, the abnormalities on MRI are not related to the accident…they were present antecedent to the accident." [#14-15 at 855]. Dr. Ogsbury informed Plaintiff that certain procedures, such as a lumbar discectomy/nerve root decompression or fusion, would likely not be helpful due to his minimal leg pain and minimal disc protrusion without neural involvement and absence of "demonstrable instability or spondylolisthesis." [#14-15 at 854]. He opined that Plaintiff should continue to improve with a strengthening program, occasional manipulation, and time. *Id.* Finally, he restricted Plaintiff from lifting in the bent position or lifting heavy objects, but expressed his belief that those work restrictions would subside altogether within the following six months. [#14-15 at 856].

In September 2008, Mr. Jaschke saw Dr. Scott Hompland, an anesthesiologist with Rehabilitation Associates of Colorado, and reported that the pain was no longer constant but was "somewhat waxing and waning, varying between a 3 and a 9," and he avoids standing or sitting. [#14-14 at 845-846]. He nonetheless also reported that he was "doing significantly better but would like to improve even quicker." [#14-14 at 847]. Dr. Hompland administered one L5-S1 interlaminar epidural steroid injection, which relieved Plaintiff's right leg pain but had no long-term effect on his back pain. [#14-10 at 430]. The following month, Mr. Jaschke underwent a Functional Capacity Evaluation at Dr. Mars' request "to assess [Plaintiff's] current physical/functional capabilities as it relates to his job as  Master Mechanic…to assist in determining permanent work restrictions (if any), and impairment." [#14-11 at 551]. Plaintiff reported exercising independently three times a week for cardio and four times a week for strength. *Id.* His symptoms "flared following stationary standing, walking and stair climbing" and he subsequently self-terminated the test, complaining of "increased severe irritation in the lumbar spine (bilaterally) with numbness in [the] bilateral posterior lower extremities and pins & needles in the plantar surface of both feet." [#14-11 at 552-553].

During a November 7, 2008 office visit, Dr. Mars determined that Plaintiff had reached maximum medical improvement ("MMI"), that Plaintiff continued to struggle with low back pain, and he was nonfunctional. [#14-12 at 665-666]. Dr. Mars noted that Mr. Jaschke had undergone physical therapy, chiropractic adjustments, osteopathic adjustments, acupuncture, and an L5-S1 interlaminar epidural steroid injection and an EMG/nerve conduction study, which was negative for radiculopathy. [#14-12 at 663-664]. At that time, Plaintiff took one OxyContin a day, one Percocet twice a day, and Ambien at night. [#14-12 at 665]. Mr. Jaschke expressed his preference for surgery stating that "he cannot live like this." [#14-12 at 666].

On November 18, 2008, Plaintiff saw Dr. Benz who noted that sitting or standing in one place for any length of time "significantly increased" Plaintiff's symptoms. [#14-12 at 745]. Dr. Benz also noted that Plaintiff walked with a "relatively normal gait," and was constantly moving about the room, changing positions because of his pain. *Id.*  A physical examination revealed 5/5 strength throughout Plaintiff's bilateral lower extremities and straight leg raising produced back, posterior thigh, and buttock pain bilaterally. *Id.*

During a visit on November 21, 2008, Dr. Mars noted that at MMI, Plaintiff had a whole person impairment of eight percent, and recommended the following restrictions for Mr. Jaschke: lifting no more than 20 pounds with frequent lifting and or carrying of up to 10 pounds; no frequent squatting, bending, or climbing; and frequent position changes. [#14-12 at 661, 663]. Dr. Mars saw Plaintiff again on December 4, 2008, when he reviewed one and a half hours of surveillance film that showed Mr. Jaschke "sitting, twisting while sitting, bending, bike riding, and weight lifting." [#14-12 at 660-661]. Dr. Mars opined that Plaintiff's "activity on the surveillance tapes contradict[ed] his performance during the functional capacity evaluation," and revised Plaintiff's work restrictions to simply no lifting over 30 pounds. [#14-12 at 661].

On December 16, 2008, Mr. Jaschke saw Dr. Hompland, who opined that the pain was "multifactorial, where the disks and the joints including the S1 joints and the facets are all contributors." [#14-10 at 431]. Dr. Hompland noted that Plaintiff's pain level had improved, and was better "with medications, stretching, a massage chair, ice after exercise and short bike rides," was "exacerbated by prolonged sitting or standing," and his level of function had dramatically improved "with the adding of the Avina." [#14-14 at 838]. In March 2009, Dr. Hompland reported that Plaintiff's pain varied from mild to severe and his pain seemed to be somewhat better. [#14-14 at 831]. He noted that Plaintiff's medication was causing "significant

sleepiness, daytime sedation, fatigue, and what [Plaintiff] perceives as respiratory depression." *Id.* Mr. Jaschke was working as a service manager at that time, and told Dr. Hompland that "when he gets sedated he feels that he cannot think very well and would not feel comfortable driving." *Id.*

In May 2009, Plaintiff presented to Dr. William Milliken for a division independent medical examination (DIME) for purposes of his workers' compensation claim. [#14-8 at 303-307]. Dr. Milliken noted that Plaintiff was working as a service manager for an auto parts store. [#14-8 at 308]. Dr. Milliken reported that Plaintiff had no sensory problems, he could walk on his heels and toes and could "easily" walk on his toes and heels [#14-8 at 309-310]. He also noted Mr. Jaschke's "visible discomfort" in the waiting room and in the examination room. [#14-8 at 307]. He disagreed with the prior MMI determination, opining that Plaintiff had worsened over time. [#14-8 at 307-308]. Dr. Milliken concluded that Plaintiff had a whole body impairment of twenty-two percent. [#14-8 at 310].

The following month, Dr. Hompland noted that Plaintiff's pain was moderate to severe and he was working six hours per day. [#14-14 at 823]. Dr. Mars reported that Plaintiff was happy to be back at work and "doing better," but was still taking daily pain medication and felt that his back pain was slowly worsening. [#14-10 at 468]. Plaintiff was taking one pain pill (Percocet) in the afternoon and sometimes an additional one at night. [#14-10 at 468-69]. Dr. Mars noted that Mr. Jaschke was "clearly worse," than when he had determined Plaintiff's MMI six months prior, and recommended an additional lumbar MRI. [#14-10 at 469]. The MRI revealed stable vertebral heights, alignment, and configuration; degenerative changes; and minimal disc bulge. [#14-8 at 321]. The disc protrusion extended "into the left lateral recess and neural foramina with encroachment upon and impingement of the exiting nerve roots in the

lateral recess and neural foramina," along with procession of degenerative disc disease at L3-L4 with interval loss of disc height and hydration, but no extruded disc fragment." [#14-8 at 322].

In July 2009, Dr. Mars noted that Mr. Jaschke was neurologically intact, his pain had lessened to 4/10 now that he was no longer working, but the pain could be severe with certain movements and his activity was limited. [#14-12 at 654-655]. Plaintiff's work restrictions remained the same. [#14-12 at 654]. That month, Plaintiff had a nerve conduction study performed by Roberta Anderson-Oeser, M.D., which did not show lumbar radiculopathy. [#14-8 at 326-28]. Dr. Anderson-Oeser noted that Plaintiff had no difficulty getting from a seated to a standing position; ambulated with a normal tandem gait; had full motor strength throughout; intact sensation; and had a normal straight leg raise test. [#14-8 at 327]. Dr. Anderson-Oeser recommended that Plaintiff proceed with a "left S1 transforaminal epidural steroid injection," and encouraged Plaintiff to continue with home stretching and exercise and medications as needed for pain control. [#14-8 at 328]. The next day, Dr. Hompland noted Plaintiff's pain was generally improved with Percocet and he had no side effects from the medication. [#14-10 at 418-419]. Plaintiff elected at that time to not proceed with the epidural. [#14-10 at 419]. That same month, Plaintiff told Dr. Benz that he was able to return to a desk-type job, but that it was a struggle for him to walk more than a mile or so a day without increased back pain. [#14-10 at 453]. Dr. Benz felt that Plaintiff should have a "minimally invasive fusion." *Id.*

Mr. Jaschke received an epidural steroid injection in his back in late July 2009, and reported to Dr. Mars that he felt "90% improved." [#14-12 at 651]. He reported occasional pain in both legs, but stated that he had been swimming and walking. *Id.* Dr. Mars noted that because Plaintiff still required narcotics for pain management despite the improvement following the injection, surgery should be considered. [#14-12 at 651].

On August 14, 2009, Dr. Mathwich, also of WorkWell Occupational Medicine, noted that Mr. Jaschke had lost weight and recommended that he drop below 250 pounds stating that weight loss was the most important factor for improvement of his back pain.  [#14-12 at 652-653].  At this time Plaintiff was hiking and walking more frequently and taking an occasional Percocet.  *Id.*  He changed positions frequently while sitting and had significantly decreased range of motion.  *Id.*  In September 2009, Plaintiff received a trigger point injection that brought him some relief and restored his full range of motion in his back.  [#14-12 at 647].  At that time his lower leg strength and sensation were intact.  *Id.*

In October 2009, Dr. Hompland noted that Plaintiff's pain varied between 3 and 7, and that he was overall "getting better," and had no side effects from his pain medications.  [#14-14 at 808].  The next month, Dr. Hompand administered medial branch block injections in the right side of Plaintiff's back.  [#14-14 at 806].  Dr. Greg Reichardt, a physician at Rehabilitation Associates of Colorado, felt that Plaintiff was "doing somewhat better" after the injections, he had no leg pain but did have back pain, he was able to go fishing over the weekend, and he was sleeping better.  [#14-9 at 357, 361].  Dr. Mars also noted that Plaintiff had significant pain relief from the injections, his range of motion was near normal, he was able to walk on his heels and toes, and he had a normal gait.  [#14-12 at 639].

In December 2009, Dr. Reichardt felt Plaintiff was doing much better in terms of function but his pain was worse.  [#14-9 at 352].  Plaintiff had been swimming, walking, and exercising, but continued to have pain with sitting, standing, and walking.  *Id.*  He had a normal gait, strength, reflexes and sensation, but decreased lumbar range of motion.  *Id.*  Dr. Reichardt informed Plaintiff that he appeared to have maximized his conservative management of the condition and should proceed with a decision regarding surgery or "moving towards MMI," and

encouraged him to "get by without surgery." *Id.* Dr. Reichardt also opined that Plaintiff was able to return to modified duty, per the restrictions identified by Dr. Mars. [#14-9 at 354]. That same day, Dr. Mars wrote that, while Plaintiff still felt a "clunk" in the low back associated with some mild pain, "he is feeling stronger and feels that the exercise is proactive." [#14-12 at 635]. In January 2010, another MRI demonstrated a diffuse disc bulge in Mr. Jaschke's back that resulted in a "mild mass affect" upon his exiting nerve roots. [#14-12 at 754]. Such result was not a significant change from a previous MRI taken in March 2008. [*Compare* Tr. 754 *with* 324]. In March 2010, Dr. Mars noted that Plaintiff was having back surgery and that his work restrictions remained the same. [#14-12 at 630].

On March 9, 2010, Mr. Jaschke underwent an L5-S1 posterolateral fusion with transforaminal lumbar interbody fusion (hardware placement), which was performed by Dr. Benz. [#14-12 at 749-750]. The preoperative and postoperative diagnoses were "L5-S1 degenerative disc disease, facet arthropathy, herniated nucleus pulposus." *Id.* Dr. Mars referred to the procedure as a L5-S1 arthrodesis and opined that Plaintiff would reach MMI at six months following surgery. [#14-12 at 630]. The independent medical examiner, Dr. Gurvey, opined that from the date of surgery through September 9, 2009, Plaintiff was in a postoperative phase and the severity of his musculoskeletal impairment met the severity of Listing 1.04(A).[3]

On September 10, 2010, a CT scan of Plaintiff's lumbar spine was performed in order to determine whether the hardware placed at the time of the fusion was properly seated. [#14-17 at 1044]. On October 05, 2010, Dr. Hompland reviewed the CT scan and noted that a "right-sided

---

[3] A claimant meets Listing 1.04(A) if there is evidence of "nerve root compression characterized by neuroanatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.04; *see also Fischer-Ross v. Barnhart*, 431 F.3d 729, 735 (10th Cir. 2005) (discussing the criteria of Listing 1.04).

screw at L5-S1 is approximately 3 mm distal to the anterior cortex, but appears to be in proper position through the pedicles. Vertebral body heights are maintained. There is a spacer at L5-S1 [with] mild anterior degenerative changes at L1-2 and L3-4." [#14-14 at 776]. Later that month, Dr. Mars wrote that Mr. Jaschke had shown initial improvement but was struggling again with low back pain and continued to take morphine sulfate and Percocet. [#14-12 at 614]. Dr. Mars noted that for Workers' Compensation purposes, Mr. Jaschke was at MMI whole person impairment of eighteen percent. [#14-12 at 615]. An October 11, 2010 Functional Capacity Evaluation reflected that Plaintiff believed the surgery had improved his ability to walk and stand, that he noted improvement from physical therapy, and he participated in an aquatic program five to six days a week. [#14-11 at 545].

In November 2010, Dr. Hompland noted that Plaintiff continued to experience low back pain varying from 2.5 to 7.5, but was "feeling better since he [was] exercising," and had a normal gait and no spasms. [#14-14 at 772]. Plaintiff was engaged in the following therapies to deal with the pain: multiple medications, pool therapy, hot tub, exercise, rest, changing positions every five minutes, and a SI joint injection. *Id.*

In January 2011, Mr. Jaschke had another DIME conducted by Dr. Milliken. [#14-15 881-888]. Dr. Milliken noted that, after his March 2010 surgery, Plaintiff was "overall much better," his range of motion was much better, and the hardware in his back was in a good position. [#14-15 at 884]. Plaintiff was still complaining of back pain and "intermittent posterior right leg pain radiation with some pins and needs sensations in the lower calf to the heel." [#14-15 at 885]. Mr. Jaschke's pain level was no better than 3 out of 10 as long as he was medicated. *Id.* Dr. Milliken recommended that Plaintiff follow Dr. Mars' permanent work

restrictions, he opined that he was at maximum medical improvement, and he assigned Plaintiff a whole body impairment of twenty-four percent.  [#14-15 at 886-887, 890-991].

In March 2011, Dr. Hompland reported that Plaintiff's pain was "75% improved from prior surgical position; currently on pain medications, muscle relaxants and sleeping pills." [#14-17 at 1082].  His pain level varied "between a 2 and a 7," and his "overall function [was] fair."  *Id.*  Mr. Jaschke explained that he had applied for a job and was interviewing.  *Id.*  Dr. Hompland anticipated that Plaintiff would "go back and join the work force, continue his home exercise program and learn to adapt to his current and new situation."  *Id.*

On April 7, 2011, another MRI scan of the lumbar spine was performed at the order of Dr. Hompland.  The impression revealed moderate stenosis at L4-5 and mild stenosis at L3-4, and showed less broad based disc and less narrowing at the level of surgery than the prior MRI with "no definite affect upon the nerve roots now."  [#14-15 at 904-905].  Dr. Benz reviewed the MRI and reported that he saw no evidence of any hardware problems and he recommended "just using good body mechanics," but no other specific functional restrictions.  [#14-15 at 893].  That same day, Plaintiff met with Dr. Hompland and discussed that he was "70% better on most days, occasionally 30% better than he was, but at this point he is 'greedy' and wanting to be completely pain free."  [#14-17 at 1077].  Dr. Hompland opined that "pain free" was "probably not likely based upon the injury he had and the surgical interventions which he has undergone." *Id.*  The next month, Dr. Hompland reported that Plaintiff's back pain was significantly improved after surgery but he required ongoing medication use.   [#14-17 at 1073].  Dr. Hompland noted, "[h]e functions reasonably well but cannot find gainful employment." *Id.*

Mr. Jaschke was approved for Medicaid during the early part of 2011 and began to seek second opinions from non-workers' compensation doctors in April 2011.   At that time, his

primary treating physician, Dr. Shawn Otteman, performed a CPX (Complete Physical Examination) of Mr. Jaschke.  [#14-18 at 1144-1147].

In June 2011, Mr. Jaschke began treatment for his low back pain with Dr. Michelle Pepper.  [#14-17 at 1118-1121].   Dr. Pepper's examination showed normal motor strength, sensation, reflexes, coordination and gait.  Plaintiff was able to rise on his toes and heels without difficultly and he reported that his last injection provided him with fifty percent pain relief.  [#14-17 at 1107, 1118].  In September 2011, Mr. Jaschke stated that his left knee was feeling better.  [#14-18 at 1201].  In December 2011 and January 2012, he had a series of lubricant injections in his knees.  [#14-18 at 1196-1197].

In January 2012, neurosurgeon Dr. Sharad Rajpal noted that Plaintiff had overall improvement with his low back pain but was currently complaining of radiculopathy.  [#14-17 at 1016].  Dr. Rajpal noted that Plaintiff had a history of polyneuropathy "with what appears to be an L4-L5 radiculpathy with pain radiating down the posterior thighs and calves into the largest toes."  *Id.*  Plaintiff told Dr. Rajpal that he had recently started taking Humira due to a positive HLAB-27 test5 with "some significant improvement in his low back and bilateral knee pain."  *Id.* Also, he was taking Gabapentin which gave him "excellent relief" of his radiculopathy.  *Id.* Dr. Rajpal felt that Plaintiff's x-rays demonstrated mild degeneration and minimal disc space narrowing but, otherwise, the spaces were well maintained, and his range of motion was adequate.  [#14-17 at 1018].  Likewise, his MRI demonstrated stable postoperative changes.  *Id.* Dr. Rajpal prescribed another injection to Plaintiff's spine.  [#14-17 at 1019].

On February 22, 2012, rheumatologist Dr. Joseph Lutt completed a Lumbar Spine Medical Source Statement (MSS) for Plaintiff.  The ALJ acknowledged during the course of the hearing that he had not received the MSS and the medical expert likewise did not have a copy.

On the MSS form, Dr. Lutt listed Mr. Jaschke's diagnoses as ankylosing spondylitis, iritis, lumbar spondylosis, lumber degen dix [degenerative disc] disease, and knee pain. [#14-18 at 1207]. Dr. Lutt opined that Mr. Jaschke was limited to walking up to 30 yards on a bad day and two to three miles on a good day. [#14-18 at 1208]. He further opined that Mr. Jaschke should not sit for any amount of time and should stand for only five to ten minutes at a time. *Id.* Dr. Lutt recommended that Mr. Jaschke sit and stand or walk less than two hours total in an eight hour work day. *Id.* Additionally, he suggested that Plaintiff would need a job that allowed him to shift positions at will from sitting, standing, and walking. *Id.* Dr. Lutt also noted that Mr. Jaschke should rarely lift and carry weight of ten pounds or less and should never lift and carry more than twenty pounds. [#14-18 at 1209]. Dr. Lutt also opined that the severity of Mr. Jaschke's symptoms would probably interfere with his attention and concentration twenty-five percent or more of a work day, and that if working full-time, he would be absent from work more than four days each month. *Id.*

b. *Knee Pain*

Mr. Jaschke turned his knee in the summer of 2009. On July 29, 2009, Plaintiff presented at Boulder Community Hospital for right medial knee and a questionable fracture given his level of discomfort. [#14-10 at 441-42]. An x-ray of the right knee showed no fracture or dislocation, and noted a probable "small suprapatellar knee joint effusion." [#14-16 at 932]. On May 19, 2011, x-rays of the left knee revealed osteoarthritic changes including "moderate narrowing of the medial joint compartment…a large convex hypertrophic ridge of the distal anterior lateral femoral condyle…small marginal osteophytes of the medial and lateral tibial plateau and of the distal medial femoral condyle." [#14-16 at 941]. There was "some hypertrophic change of the posterior-lateral aspect of the lateral tibial plateau." *Id.* There was no chondrocalcinosis, no

evidence of knee joint effusion, and no erosive change. *Id.* A May 29, 2011 MRI of the left knee showed a "[d]egenerative undersurface tear throughout the posterior horn medial meniscus [with] associated degenerative change." [#14-16 at 944]. Arthroscopic surgery of the left knee followed, and on June 22, 2011, Plaintiff underwent a left knee partial medial and partial lateral meniscectomy with chondroplasty. [#14-16 at 959].

On September 25, 2011, Mr. Jaschke told his knee surgeon, Dr. Lynn Voss of Boulder Orthopedics, that he was doing well with regard to his left knee, and that his back pain was causing him the most difficulty. [#14-18 at 1201]. On September 30, 2011, an MRI of the right knee revealed a "complex tear, including prominent radial tear involving the body and free edge portion of the posterior horn of the medial meniscus, with an additional horizontal oblique tear component contacting the mid inferior articular surface of the posterior horn of the medial meniscus." [#14-14 at 848-849]. The MRI also showed "a moderate to severe tricompartmental osteoarthritis predominantly involving the medial tibiofemoral compartment where there is severe cartilaginous thinning and moderate associated subchondral edema." [#14-14 at 849]. On October 25, 2011, Dr. Voss performed a partial medial meniscectomy with chondroplasty and removal of loose body on Plaintiff's right knee. [#14-16 at 986]. In December, 2011 and January 2012, Mr. Jaschke underwent a total of five Supartz injections bilaterally into his knees. [#14-18 at 1196, 1197].

c. *Ankylosing Spondylistis*

Ankylosing spondylitis is an autoimmune disorder. On September 15, 2011, Mr. Jaschke tested positive for HLA-B27 antigen, which is an indicator but not conclusive that Mr. Jaschke has ankylosing spondylitis. [#14-18 at 1170, 1192]. That same day, Plaintiff met with Dr. Lutt, who ordered a panel of laboratory tests and a diagnostic imaging study of Plaintiff's sacroiliac

joints.  [#14-18 at 1180, 1195].  The imaging study showed "minimal apparent early osteophyte formation with associated sclerosis, particularly along the ilial aspects of the sacroiliac joints within their mid to inferior portions."   [#14-18 at 1195].   The sacroiliac joints otherwise appeared unremarkable, with "[n]o erosion or ankyloses" demonstrated.  *Id.*  Dr. Gurvey testified that "although the claimant might develop this impairment [i.e., ankylosing spondylitis], it was not present in the medical record."  [#14-3 at 43].

      d.   *Psychological Assessment*

In a psychological assessment performed September 17, 2009, Dr. Ron Carbaugh reported that Plaintiff had probable personality traits or coping style affecting pain management, and opined that Plaintiff's behavior was "quite elevated and dramatic," but noted there was "little other suggestion of symptom magnification."  [#14-9 at 413; #14-13 at 771].  Dr. Carbaugh recommended a "brief course of pain and adjustment counseling."  [#14-13 at 771].  On October 19, 2010, Mr. Jaschke saw Dr. Carbaugh, who noted that from a psychological standpoint, Mr. Jaschke was at MMI in that he had no psychological restrictions as far as his ability to work was concerned.  [#14-13 at 759-760].  Dr. Carbaugh reported that Mr. Jaschke's Pain Patient Profile in the areas of depression, anxiety, and somatization fell below the mean for pain patients, indicating that psychological issues should not interfere with physical treatment.  [#14-13 at 770].  Dr. Carbaugh recorded that Plaintiff believed the fusion surgery "was worth it," in that he estimated that he had gained a 30% decrease in his subjective pain intensity.  [#14-13 at 759-760].

At Step Two, following a review of these records and the testimony of Dr. Gurvey and Mr. Jaschke, the ALJ determined that Plaintiff had the following severe impairments: a history of lumbar fusion; lumbar degenerative disc disease; a history of bilateral knee pain and

arthroscopies; and obesity.  [#14-3 at 40].  With respect to ankylosing spondylistis, the ALJ found that Dr. Lutt's "records do not contain any objective signs and findings consistent with the disease."  *Id.*  The ALJ agreed with Dr. Gurvey's testimony that "the sole evidence in the record that the claimant suffers from ankylosing spondylistis consists of an abnormal laboratory study," and that Dr. Lutt had "found no evidence of swelling, warmth, tenderness or erythema in any joint in an exam on September 15, 2011 and did not even examine the claimant's back."  *Id.*  Dr. Lutt's subsequent observations and records indicated that medication had benefited Plaintiff's low back stiffness and knee and wrist pain.  *Id.*  Ultimately, the ALJ declined to accept Dr. Lutt's diagnosis of ankylosing spondylitis on account of a "complete lack of objective medical signs or findings"; specifically, that there was no evidence Plaintiff had such a condition as "established by medically acceptable clinical or laboratory diagnostic techniques showing the existence of a medical impairment which results from anatomical physiological or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged."  [#14-3 at 41 (citing 20 C.F.R. 404.1529(b)].

As to Mr. Jaschke's psychological limitations, the ALJ noted that Dr. Carbaugh administered only two tests and gave Plaintiff no psychological restrictions.  [#14-3 at 41].  The ALJ concluded that to the extent Mr. Jaschke had a psychological condition, there was no evidence that the condition significantly limited his physical or mental ability to perform basic work activities, and was therefore non-severe in nature.  *Id.*  The ALJ then determined that Mr. Jaschke was mildly restricted in activities of daily living, taking into consideration Plaintiff's testimony along with the surveillance videos as reviewed by Dr. Mars and Dr. Milliken.  [#14-3 at 41].  The ALJ also determined that Plaintiff has no difficulties in social functioning.  *Id.*  The ALJ found that Mr. Jaschke has mild difficulties with respect to concentration, persistence, and

pace, based on Plaintiff's testimony that he can watch television and read short sections of magazines and books. *Id.* The ALJ noted that Plaintiff had never exhibited significant concentration deficits in any of the medical examinations. *Id.*

### 2. Assessment of Credibility

At Step Three, after considering the testimony of Dr. Gurvey, the treating and examining physicians, and Mr. Jaschke, the ALJ concluded that none of Plaintiff's impairments met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. He thus proceeded with a Step Four analysis, and determined that Plaintiff had RFC to perform light work as defined in 20 C.F.R. § 404.1567(b), "except that he can sit, stand and walk 6 hours each in an 8 hour day, never push or pull, never climb ladders, ropes or scaffolds, occasionally crawl and never tolerate exposure to unprotected heights." [#14-3 at 40-53].

### a. *Dr. Gurvey's Testimony*

The ALJ found that Dr. Gurvey's testimony was "amply supported by the objective medical evidence," and thus gave it great weight at step three of his evaluation, in determining that the severity of Mr. Jaschke's L5-S1 fusion and lumbar degenerative disk disease did not meet the criteria of Listing 1.04(A), except for the six month period of time between March 9, 2010 and September 9, 2010. [#14-3 at 45]. In particular, the ALJ accepted Dr. Gurvey's finding that the record indicated that between July 9, 2008 and March 9, 2010, "there was no evidence of nerve root compression, spinal arachnoiditis or lumbar spinal stenosis," so as to meet Listing 1.04(A). [#14-3 at 42]. Dr. Gurvey testified that the record for this time showed primarily a history of pain with no abnormal neurological findings and a normal EMG and NCV study. *Id.* Dr. Gurvey also testified that Plaintiff's condition did not meet or equal the criteria of

Listing 1.04(A) from September 9, 2010 until the date of the administrative hearing.  [#14-3 at 43].  He based his opinion on the fact that Plaintiff's post-operative neurological exams were normal, Plaintiff's physicians had reported no tenderness, and that straight leg raising was negative bilaterally.  [#14-3 at 44].  Furthermore, he noted that the April 7, 2011 and September 13, 2011 MRIs showed nothing very significant in the lumbar spine at those times.  [#14-3 at 45].  In sum, Dr. Gurvey accepted that Plaintiff had radiculopathy, which is merely one of the requirements for meeting or equaling Listing 1.04(A),[4] but nonetheless determined that Listing 1.04 was not met because, despite Plaintiff's subjective pain complaints, "the objective findings did not support a conclusion that his impairment(s) met or equaled" that Listing.  *Id.* Additionally, Dr. Milliken's January 2011 exam of Plaintiff showed fifteen percent impairment in overall lumbar range of motion, but noted normal reflexes and abnormality only in weakness of toe raising.  [#14-3 at 50].

The ALJ found that Plaintiff's bilateral knee pain and history of bilateral arthroscopies did not meet the criteria of Listing 1.02 because there was no evidence in the record of:

> gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s) and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction or ankylosis the affected joints.

*Id.*  In addition, Dr. Gurvey testified that nothing in the record indicated that Plaintiff had not done well following his knee surgeries, and that while Plaintiff "probably has some ongoing complaints of knee discomfort…there was no objective evidence that the claimant had severe knee pain."  [#14-3 at 43-44].  Dr. Gurvey further testified that the restrictions of crawling only

---

[4] To meet a listing, a claimant's impairments "must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severe, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530-31 (1990) (emphasis in original).

occasionally and never climbing ladders, scaffolds, or ropes would suffice to accommodate Plaintiff's knee impairments. *Id.*

      b. *Treating and Examining Physicians*

The ALJ additionally relied on the findings of Drs. Benz, Mars, Milliken, and Rajpal in determining that Mr. Jaschke was not disabled. *See* [#14-3 at 48-52]. He observed that Plaintiff "has had repeatedly normal neurological and musculoskeletal exams, normal x-rays and MRIs showing only mild degenerative disk disease and spinal pathology." [#14-3 at 52]. Plaintiff repeatedly had negative straight leg raising tests and he received significant pain relief from the L4-5 facet injection. [#14-3 at 53]. And, Plaintiff had good results from bilateral knee arthroscopies and "lack of further treatment for knee pain indicate[s] that his knee problems do not cause additional limitations other than those acknowledged by Dr. Gurvey." [*Id.*] The ALJ also noted that while obesity is a medically determinable impairment, it alone cannot be used as a basis for finding a disability. [#14-3 at 43-44]. And, although obesity may be used in conjunction with another listing for determining whether an individual's impairments satisfy a Listing, "there [was] no indication in the record" that Plaintiff's obesity considered in conjunction with his other impairments met or equaled a listed impairment in Appendix 1. [*Id.*]

The ALJ then took into consideration that no treating or examining physician had given Plaintiff functional restrictions greater than those originally set forth by Dr. Mars, who, on July 9, 2008, recommended that Plaintiff change positions frequently, lift twenty pounds maximum, lift or carry up to ten pounds frequently, and refrain from frequent squatting, bending, and climbing. [#14-12 at 679]. Dr. Benz recommended conservative treatment and "good body mechanics but no other specific restrictions." [#14-15 at 893]. Dr. Mars then invalidated his previous restriction as a result of Plaintiff's performance on the surveillance tape, and

recommended no lifting above thirty pounds. [#14-12 at 661]. Dr. Milliken opined that Plaintiff should follow Dr. Mars' restrictions. [#14-15 at 886-887, 890-991]. Finally, Dr. Rajpal did not give Plaintiff any restrictions. *See* [#14-17 at 1016-1019]. On October 20, 2010, Dr. Mars placed Plaintiff at MMI with restrictions of lifting a maximum of twenty pounds and performing no repetitive bending at the waist. [#14-11 at 556]. The ALJ adopted this RFC assessment in part. He declined to accept the restriction as to bending at the waist on the basis of multiple negative straight leg raising tests and relief received from an L4-5 facet injection. He then accommodated Plaintiff's history of knee pain and obesity by restricting him to never climbing ladders, ropes, or scaffolds, crawling only occasionally, and never working at unprotected heights. [#14-3 at 53]. To the extent Mr. Jaschke argues that the ALJ should have adopted Dr. Mars' earlier opinion regarding frequent position changes, Dr. Mars abandoned that restriction in October 2010. [#14-11 at 556]. And, with respect to Plaintiff's argument that the ALJ failed to consider his attempt in 2009 to return to light work as a service writer [#19 at 40], a previous attempt to work is but one of many factors an ALJ should consider in assessing RFC. The record demonstrates that the ALJ properly considered all of the evidence, even if he did not fully discuss all of the evidence. This is all that is required. *See Clifton v. Chater,* 79 F.3d 1007, 1009–10 (10th Cir. 1996) (citing *Vincent ex rel. Vincent v. Heckler,* 739 F.2d 1393, 1394–95 (9th Cir. 1984)).

c.   *Mr. Jaschke's Testimony*

Mr. Jaschke contends that the ALJ failed to properly credit his complaints of pain. [#19 at 29]. "A claimant's subjective allegation of pain is not sufficient in itself to establish disability. Before the ALJ need even consider any subjective evidence of pain, the claimant must first prove by objective medical evidence the existence of a pain-producing impairment that could

reasonably be expected to produce the alleged disabling pain." *Thompson v. Sullivan,* 987 F.2d 1482, 1488 (10th Cir. 1993) (citations omitted). The ALJ was required to consider all the relevant objective and subjective evidence and "decide whether he believe[d] the claimant's assertions of severe pain," *Luna v. Bowen,* 834 F.2d 161, 163 (10th Cir. 1987). "Findings as to credibility should be closely and affirmatively linked to substantial evidence...." *Huston v. Bowen,* 838 F.2d 1125, 1133 (10th Cir. 1988). "Credibility determinations are peculiarly the province of the finder of fact, [however,] and we will not upset such determinations when supported by substantial evidence." *Diaz v. Secretary of Health & Human Servs.,* 898 F.2d 774, 777 (10th Cir. 1990). In evaluating complaints of pain, consideration is given to: (1) whether the claimant established a pain producing impairment by objective medical evidence; (2) if so, whether there is a "loose nexus" between the proven impairment and the claimant's subjective complaints of pain; and (3) if so, whether considering all the evidence, both objective and subjective, is the claimant's pain is in fact disabling. *See Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir. 1994) (quoting *Musgrave*, 966 F.2d at 1375-76). Additionally, in determining whether Plaintiff's subjective complaints of pain are credible, the ALJ should consider various factors, such as:

> the levels of medication and their effectiveness, the extensiveness of the attempts (medical or nonmedical) to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, the motivation of and relationship between the claimant and other witnesses, and the consistency or compatibility of nonmedical testimony with objective medical evidence.

*Wilson v. Astrue*, 602 F.3d 1136, 1146 (10th Cir. 2010) (quoting *Branum v. Barnhart,* 385 F.3d 1268, 1273-74 (10th Cir. 2004)).

Here, the ALJ noted that he must first determine whether there is an underlying medically determinable physical or mental impairment that can be shown by medically acceptable clinical

and laboratory diagnostic techniques to produce, or could be reasonably expected to produce, Plaintiff's pain or other symptoms.   [#14-3 at 46].   He then explained that once such an underlying physical or mental impairment has been identified, he must evaluate "the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's functioning."   *Id.*   He acknowledged that if statements concerning the intensity, persistence, and functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, he "must make a finding on the credibility of the statements based on a consideration of the entire case record."   *Id.*

Applying this frame work, the ALJ found that Mr. Jaschke's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but that his statements concerning the intensity, persistence, and limiting effects of his symptoms were not credible to the extent they were inconsistent with the RFC assessment.   [#14-3 at 47].   The ALJ wrote that while he found Mr. Jaschke's pain complaints partially credible, "his acknowledged daily activities suggest that he can do more than he alleges."   [*Id.*]   The ALJ then recounted Plaintiff's exercise routine, which included visiting the gym for forty-five minutes to an hour Monday through Friday, and using the hot tub and steam room, and Plaintiff's testimonial on June 15, 2010 that he hikes twice a week and swims six times a week.   [*Id.*]   *See Wilson*, 602 F.3d at 1146 (ALJ reasonably found a claimant's description of her daily activities did not indicate significant limitations).   The ALJ further observed that "except when he suffered occasional exacerbations of back pain" and during the six-moth post-operative period, clinical examinations by Plaintiff's treating physicians were generally normal, and Plaintiff did not tell his physicians that he was unable to sleep except in a hammock, or report medication side effects.   *Id.*

Where the ALJ properly weighed the medical opinion evidence and gave good reasons for his decision, the reviewing court may not disturb the ALJ's decision simply because an inconsistent conclusion could be drawn from the evidence.  *See Lax*, 489 F.3d at 1084 (citing *Zoltanski v. F.A.A.,* 372 F.3d 1195, 1200 (10th Cir. 2004)).   The ALJ set forth the specific evidence he relied on in his evaluation of Plaintiff's credibility, *see Poppa*, 569 F.3d at 1171, and he articulated specific reasons for questioning the claimant's credibility.  *See Wilson*, 602 F.3d at 1144 (citing *Marbury v. Sullivan,* 957 F.2d 837, 839 (11th Cir. 1992)).   Accordingly, this court finds that the ALJ's RFC determination, including the evaluation of Plaintiff's subjective complaints, is supported by substantial evidence in the record.

**C.      New Evidence Before the Appeals Court**

Mr. Jaschke contends that he submitted evidence to the Appeals Court that was new, material, and related to the period leading up to, and including, the date of the ALJ's decision, and that the Appeals Court declined to consider the new evidence in contravention of 20 C.F.R. § 404.970(b), stating that the evidence did not involve the time period that the ALJ evaluated, but a later time.  [#19 at 51].   Indeed, the Appeals Court found that because the new evidence was dated September 16, 2012 and September 24, 2012, and the ALJ's decision was issued July 17, 2012, the new evidence pertained to a later time and did not affect the ALJ's determination regarding disability prior to July 17, 2012.  [#14-2 at 2].   The Appeals Court informed Plaintiff that if he wished to be considered for disability benefits following July 17, 2012, he would have to re-apply for that time period.  [*Id.*]

The new evidence consists of a Work Performance & Occupational Evaluation ("Evaluation") from Starting Point and a report from Phillips' Consulting ("Report").   The Evaluation is dated September 16, 2012 and refers to an assessment of Mr. Jaschke that occurred

over three days from September 10, 2012 through September 12, 2012. [#14-2 at 20-34]. The Report is dated September 24, 2012 and pertains to an interview that Plaintiff participated in on September 20, 2012. [#14-2 at 9-17]. This new evidence encompasses observations and conclusions that occurred after the ALJ's July 17, 2012 decision, and thus the Appeals Court did not act improperly in declining to consider it. *See, e.g., Lately v. Colvin*, 560 Fed. Appx. 751, 753 (10th Cir. 2014) (agreeing that evidence was properly not considered because it post-dated the ALJ's decision).

## CONCLUSION

The court is satisfied that the ALJ considered all relevant facts and that the record contains substantial evidence from which the Commissioner could properly conclude under the law and regulations that Mr. Jaschke was not disabled within the meaning of Title II of the Social Security Act and therefore not eligible to receive Disability Insurance Benefits. Accordingly, IT IS ORDERED that the Commissioner's final decision is AFFIRMED and this civil action is DISMISSED, with each party to bear his and her own fees and costs.

DATED: September 30, 2015                     BY THE COURT:


                                              s/ Nina Y. Wang_____
                                              United States Magistrate Judge